# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 14-898V
Filed: July 15, 2024

```
* * * * * * * * * * * * * * * * * * * * * *   *
                                             *
THEODORE BRYAN,                              *
                                             *
                  Petitioner,                *
                                             *
v.                                           *
                                             *
SECRETARY OF HEALTH AND                      *
HUMAN SERVICES,                              *
                                             *
                  Respondent.                *
                                             *
* * * * * * * * * * * * * * * * * * * * * *   *
```

*Richard Gage*, Richard Gage, P.C., Cheyenne, WY, for Petitioner
*Camille Collett*, U.S. Department of Justice, Washington, DC, for Respondent

## RULING AWARDING DAMAGES[1]

**Oler**, Special Master:

On September 23, 2014, Theodore Bryan ("Mr. Bryan" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa -10, *et seq*.[2] (the "Vaccine Act" or "Program"). The petition alleges that Mr. Bryan developed chronic fatigue syndrome ("CFS") as a result of the influenza ("flu") vaccination he received on October 10, 2011. Amended Pet. at 1-2.

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I issued a Ruling on Entitlement on October 9, 2020. Ruling on Entitlement (ECF No. 132). I then conducted a damages hearing on June 28, 2023, which concluded on September 7, 2023. The parties filed post-damages hearing briefs on November 22, 2023. ECF Nos. 219, 220.

For the reasons set forth below, I find that Petitioner should receive an award for actual pain and suffering in the amount of $210,000.00, and an award for future pain and suffering in the amount of $10,000.00 per year, for the remainder of Petitioner's life. I additionally find it is appropriate to award lost wages totaling $1,048,990, and various life care plan items, discussed in this Ruling.

## I.    Procedural History

Mr. Bryan filed his petition for compensation on September 23, 2014. ECF No. 1. The procedural history of the entitlement portion on this case is summarized in my Ruling on Entitlement. *See Bryan v. Sec'y of Health & Hum. Servs.*, 2020 WL 7089841, at *1 (Fed. Cl. Spec. Mstr. Oct. 9, 2020) (hereinafter "Ruling on Entitlement"). I summarize the procedural history for the damages stage below.

After I issued the Ruling on Entitlement, Petitioner filed a "motion to appoint expert" which was a request to hire a life care planner and economist. ECF No. 133.

I issued a damages order on October 13, 2020, instructing Petitioner to file updated medical records and any other records that would help resolve damages. ECF No. 135. On October 15, 2020, I held a status conference with the parties to discuss Petitioner's motion. *See* Minute Entry dated 10/15/2020. The parties requested to retain separate life care planners to work collaboratively and indicated they would hire economists to address lost wages. *See* Order dated 10/20/2020/, ECF No. 136. I granted the parties' request. *See id.* The parties worked together to resolve damages. ECF Nos. 142-43.

On March 3, 2021, Petitioner filed a status report indicating he did not wish to undergo the vocational testing requested by Respondent. ECF No. 144.

On March 8, 2021, I held a status conference to discuss Petitioner's concerns regarding vocational testing. *See* Minute Entry dated 3/8/2021. Dr. Lapp, Petitioner's CFS expert, believed that Petitioner could not undergo vocational testing without experiencing serious adverse health consequences. *See* Scheduling Order dated 3/8/2021, ECF No. 145. Furthermore, Petitioner had informed Mr. Gage that he does not intend to re-enter the work force given his Social Security determination. *See id.* I ordered Petitioner to file all Social Security documentation in his possession and gave Respondent additional time to articulate his position regarding vocational testing. *Id.*

On May 7, 2021, Respondent filed a status report stating he does not require Petitioner to undergo vocational testing. ECF No. 147.

On May 19, 2021, Petitioner filed an economic loss report authored by Dr. Mark McNulty. Ex. 66. On June 7, 2021, Petitioner filed a life care plan formulated by Ms. Elizabeth Kattman

along with a list of out-of-pocket expenses. Exs. 67-68. On the same day, Petitioner also filed a status report confirming that a settlement demand had been sent to Respondent. ECF No. 152.

On June 22, 2021, Respondent filed a status report indicating that he would like to file a "substantive response to petitioner's life care plan" and that he was in the process of retaining an economist to respond to Petitioner's economic loss report. ECF No. 154.

On July 16, 2021, Petitioner filed letters from his acupuncturist, chiropractor, primary care physician, and massage therapist. Exs. 69-72. On September 13, 2021, Petitioner filed his tax returns, Social Security earning statement, and his last pay stub. Exs. 73-75.

On January 31, 2022, Respondent filed a "Response to Petitioner's Economic Loss Report", which contested Dr. McNulty's work life expectancy age of 67, instead arguing for an age of 64.02. ECF No. 164.

On February 7, 2022, I held another status conference with the parties to ascertain what outstanding issues remained. *See* Minute Entry dated 2/7/2022. Respondent indicated that he would file a life care plan and economist report by March 7, 2022. *See* Scheduling Order dated 2/7/2022, ECF No. 167. Petitioner indicated he wished to file a reply brief. *See id.* I granted the parties time to submit their filings.

On February 22, 2022, Petitioner filed a sworn declaration and a responsive report from Dr. McNulty. Exs. 77-78. On March 7, 2022, Respondent filed an expert report from Dr. Roland Staud and a life care plan from Laura Fox, R.N. Exs. D, F. On June 22, 2022, Petitioner filed a supplemental report from Dr. Lapp. Ex. 79. On August 3, 2022, Petitioner filed a supplemental life care plan. Ex. 84.

On August 12, 2022, I held another status conference with the parties. *See* Minute Entry dated 8/12/2022. Petitioner indicated he believed the record was complete. *See* Scheduling Order dated 8/12/2022, ECF No. 177. Respondent requested additional time to review Petitioner's expert report and life care plan and file a status report indicating how he would like to proceed. *See id.* Petitioner had no objection, and I granted that request.

On December 2, 2022, Respondent filed a responsive report from Dr. Staud and an updated life care plan from Ms. Fox. Exs. I-J.

On January 4, 2023, Petitioner filed a status report informing the Court that Petitioner's life care planner, Ms. Kattman, had reached out to Respondent's life care planner, Ms. Fox, to discuss life care plan items that remained in dispute. ECF No. 180. Ms. Fox informed Ms. Kattman that she did not have permission to negotiate life care plan items, therefore Petitioner requested that Ms. Fox be given permission to do so, in order to come to an agreement on items in dispute. *See id.*

On January 19, 2023, I held a status conference with the parties to discuss the status of damages and Petitioner's status report. *See* Minute Entry dated 1/19/2023. The parties identified pain and suffering, work life expectancy, Social Security benefits, and life care plan items that

remained in dispute and would require a one-day damages hearing to resolve. *See* Scheduling Order dated 1/19/2023, ECF No. 182. Respondent reiterated that without additional evidence, Respondent's position regarding the life care plan remained unchanged, therefore Ms. Fox did not have authority to negotiate; Respondent relied on Dr. Staud's expert reports regarding Petitioner's symptoms and recommended treatment. *See id.* The parties were directed to file a joint status report on their availability for a one-day damages hearing.

I scheduled a damages hearing for June 28, 2023. *See* non-PDF Scheduling Order dated 2/3/2023. I directed the parties to file a joint exhibit consisting of a line-by-line chart of items in dispute. *See* non-PDF Scheduling Order dated 2/28/2023. Respondent filed an expert report from Dr. Patrick Kennedy on May 24, 2023. Ex. L.  I began the damages hearing on June 28, 2023. Due to audio issues and my unexpected illness, we ended the hearing early. Tr. at 103.

Petitioner filed two separate memoranda on pain and suffering, and his out-of-pocket expenses. ECF Nos. 203, 205.

On August 1, 2023, I held a status conference with the parties. *See* Minute Entry dated 8/1/2023. Mr. Tyler King, appearing alongside Ms. Collett and on behalf of Respondent, stated that he believed the reports of the life care planners and medical doctors could be relied upon, and only the economists should testify at the damages hearing. *See* Scheduling Order dated 8/1/2023, ECF No. 207. Mr. Gage agreed. *See id.*

The damages hearing resumed on September 7, 2023 with testimony from Dr. Mark McNulty and Dr. Patrick Kennedy. *See* Minute Entry dated 9/7/2023. The hearing ended with some remaining questions regarding Social Security benefits. I gave the parties 45 days after the filing of the damages hearing transcript to file briefs on the remaining issues.

Petitioner and Respondent filed briefs on November 22, 2023 summarizing the arguments presented on September 7, 2023. ECF Nos. 219, 220. Respondent also filed two expert reports on this same day, one from Nurse Fox and one from Dr. Kennedy. Exs. S, T.

On November 27, 2023, Petitioner filed a Motion to Strike Exs. S and T and pages 8-23 of Respondent's memorandum (ECF No. 219). ECF No. 221.

Respondent filed a response on December 11, 2023. ECF No. 222. Respondent argued that a special master is required to broadly accept any relevant materials into the record. *Id.* at 2. Respondent also contended that submission of these documents was not prejudicial or fundamentally unfair to Petitioner. *Id.* Respondent further noted that he did not object to Petitioner filing another report from Dr. McNulty. *Id.* at 3.

Petitioner did not file a reply on his docket generated deadline date of December 18, 2023.

On December 19, 2023, I denied Petitioner's motion and accepted Respondent's filings into the record. ECF No. 222. I granted Petitioner additional time to submit supplemental filings.

On January 30, 2024, Petitioner filed a memorandum on the issues in dispute. ECF No. 224. Petitioner also filed additional reports from Dr. McNulty (Ex. 100) and Ms. Kattman (Ex. 101) on the same day. ECF No. 226.

The record is now complete for a determination on damages.

## II.     Factual Summary

The Ruling on Entitlement issued on October 9, 2020 contained a medical history consolidated from Petitioner's medical records, affidavits, and hearing testimony. *See* Ruling on Entitlement at 2-10. I highlight some post-entitlement filings pertaining to Petitioner's current condition below, such as Petitioner's statements, and the life care planners' two visits during the damages phase.

Petitioner, born in 1968, and was 42 years old when he received a flu vaccination on October 10, 2011. Ex. 2 at 2. Petitioner receives Social Security disability benefits because he has been unable to work since June 1, 2014. Ex. 74, Ex. F at 1.

The life care planners ("LCPs") met with Petitioner on December 22, 2020, and prepared reports based on the visit. Exs. 68, F. Mr. Bryan was still living with his wife in Pennsylvania at this time. Ex. F at 2. Petitioner was able to ambulate around his home with a cane. *Id.* Petitioner informed the LCPs that he often had brain fog and a poor short-term memory. *Id.* Regarding daily tasks, Petitioner reported that he used the microwave but would not use an oven or stove without supervision because of his memory issues and because he is easily distractible. *Id.* at 3. Petitioner could shower on his own but did so every two to three days based on his fatigue level. *Id.* Petitioner still had his driver's license but drove infrequently; Mrs. Bryan did most of the driving. *Id.*

Mr. Bryan reported that no two days were the same; if he walks too far or helps too much around the house, he may sleep for 24-36 hours to recover. Ex. F at 3. He reported balance issues and difficulty walking and bending over, which cause dizziness. *Id.* Petitioner reported that he had daily migratory pain, which was a 7 out of 10 on the pain scale. *Id.* Petitioner was responsible for the daily care of two dogs (except for dog walking) and three birds. *Id.* at 4.

Ms. Kattman, Petitioner's life care planner, summarized a second Zoom call with Mr. Bryan on June 30, 2022. Ex. 84. Petitioner intended to move to South Carolina with his wife to live in a camper in his daughter's backyard. Ex. 84 at 1. It was their intention to find another home in South Carolina near his daughter's house. *Id.* Petitioner reported his functioning was worse due to leg weakness and pain. *Id.* at 2. He also reported that he feels like his brain function also seems slower and that he cannot concentrate on more than one thing at a time. *Id.* As a result, Mrs. Bryan took on more of the household activities. *Id.* at 2.

## III.     Expert Opinions

Five witnesses testified at the damages hearing: Petitioner's medical expert, Dr. Charles Lapp; Petitioner's life care planner, Ms. Elizabeth Kattman; Petitioner's economist, Dr. Mark McNulty; Respondent's medical expert, Dr. Roland Staud; and Respondent's economist, Dr.

Patrick Kennedy. As I indicated at the conclusion of the June 28, 2023 damages hearing, Dr. Roland Staud's testimony was to begin anew due to the audio issues. Because he was not recalled to the stand, I will not summarize Dr. Staud's limited testimony. Tr. at 103. I also incorporate relevant parts of the experts' reports into the below summary.

### A.  Petitioner's Medical Expert, Dr. Charles Lapp

I have summarized Dr. Lapp's credentials in the Ruling on Entitlement. ECF No. 132 at 10-11. Dr. Lapp began his testimony by noting that Petitioner should receive treatment from a specialist in chronic fatigue syndrome or fibromyalgia, because general practitioners often do not know the symptoms of CFS to diagnosis the disease, and therefore cannot provide adequate treatment for it. Tr. at 12. Dr. Lapp emphasized that a number of treatments, such as chiropractic treatment, massage therapy, and acupuncture, have helped alleviate some of Petitioner's pain in the past. *Id.* at 13-14, 15, 16, 19. Dr. Lapp further testified that hyperbaric oxygen treatment helps increase oxygen levels in the brain, and red light therapy reduces inflammation in the body. Although Petitioner had not tried these therapies, Dr. Lapp recommended he try them to see if they improved his symptoms. *Id.* at 18, 19.

Dr. Lapp addressed Petitioner's off-label use of naltrexone, trazadone, propranolol, lorazepam, and clonazepam. Dr. Lapp stated that off-label use of medication was "pretty common" in the medical field; the FDA approves a drug for one reason but it could have other effects that are beneficial for non-FDA approved treatment. Tr. at 22. Dr. Lapp reiterated his recommendation for curcumin, vitamin D3, and vitamin B complex. *Id.* at 27-29.

Dr. Lapp categorized Petitioner's CFS as between moderate and severe. Tr. at 34. Dr. Lapp also stated that treatment of moderate and severe CFS patients would not necessarily be different. *Id.* Dr. Lapp stated that there were no approved medications for CFS so he recommends medication based on the symptoms and pre-existing conditions of his patients. He recommends that almost all of his patients take vitamin D3 and B complex. *Id.* at 41-44.

### B.  Petitioner's Life Care Planner, Ms. Elizabeth Kattman

Ms. Kattman is a rehabilitation counselor, with a bachelor's degree in human rehabilitative services and gerontology from the University of Northern Colorado, and master's degree in special education, with an emphasis in rehabilitation counseling from Utah State University. Tr. at 48. Ms. Kattman is a certified rehabilitation counselor and has worked for Re-Entry Rehabilitation for almost 30 years. *Id.* at 49.

Ms. Kattman elaborated on facts of this case that she thought were pertinent. Ms. Kattman stated that Petitioner and his wife identified Dr. Bettina Herbert as a doctor he would like to see as his primary care physician as she is also a functional medicine specialist, however Dr. Herbert does not accept Medicare. Tr. at 52. Ms. Kattman spoke with Dr. Herbert's office but not directly with Dr. Herbert. *Id.* at 52-53, 88-89.

Ms. Kattman also testified to the utility and effectiveness of Petitioner's prior chiropractic care, acupuncture, and massage therapy, speaking to Petitioner and his treaters on the decrease in

pain and increase in mobility. Tr. at 56-59. Ms. Kattman testified the hyperbaric oxygen chamber trial was a suggestion of Dr. Smith's, while the red light therapy treatment was a recommendation from both Drs. Lapp and Smith. *Id.* at 60-61.

Regarding Petitioner's medications going forward, based on Dr. Lapp's testimony, Petitioner should stay on clonazepam, possibly at a higher dosage, if he is to proceed without lorazepam. Tr. at 65.

Ms. Kattman testified about Petitioner's CFS symptoms and living situation to demonstrate how she arrived at a recommendation of 35 hours/week of in home assistance for Mr. Bryan. Petitioner uses a cane to walk but cannot stand or sit for more than 15 minutes; he has difficulty performing household chores and showering; he can still drive but rarely does so; he has memory issues that affect his ability to complete chores and tasks throughout the day; Petitioner's wife provides all assistance currently but works a full-time job. Tr. at 68-71. Ms. Kattman testified the increase in hours of home health care after age 65 was mostly due to age, not necessarily due to worsening of Petitioner's CFS. *Id.* at 70. Regarding time for case management, Petitioner's wife also currently handles all aspects of it; Ms. Kattman believes Mrs. Bryan spends more than two hours per month, but testified that a professional would be more efficient. *Id.* at 74.

Ms. Kattman discussed the Vita Monster all-terrain scooter, recommended by Dr. Smith. She stated that this specific scooter was helpful for Mr. Bryan's previous outdoor interests such as hiking and fishing but also dog walking in his neighborhood which has dirt roads. Tr. at 75. Ms. Kattman did also state that she did not know why Dr. Smith recommended this specific model. *Id.* at 93-94. Ms. Kattman then addressed the home modification estimate in her life care plan, a total of $109,986, which is the maximum grant from the Veterans Administration (VA) for service-connected disabilities given to veterans. *Id.* at 79-80.

### C.  Petitioner's Economist, Dr. Mark McNulty, Ph.D.[3]

Dr. McNulty testified during the second part of the damages hearing regarding Petitioner's future lost wages. Factors that Dr. McNulty opined were particularly relevant when considering Petitioner's retirement age were that: Petitioner has worked since he was 18-years old; Petitioner enjoyed his job "very much" and was well liked by his employers; and Petitioner stated he would have worked until he was 67 or 68 if not for his vaccine injury. Tr. at 115-16. Dr. McNulty also considered data from the Bureau of Labor Statistics ("BLS") that provided the broad statistic that between the ages of 65 and 69, the labor force participation rate is 33%. *Id.* at 118. Dr. McNulty testified that the labor force participation rate was a relatively high number and not inconsistent with Petitioner's own statements regarding when he intended to retire. *Id.* at 119. Another factor Dr. McNulty considered was that Petitioner would have received full Social Security benefits if he had retired at age 67. *Id.* at 120.

---

[3] Dr. McNulty has a joint Ph.D. in economics and statistics. Tr. at 112. He worked at Kansas State University for 13 years teaching graduate level courses in both statistics and economics. *Id.* He then worked as an economist in the private sector for several years before relocating to Wyoming. *Id.* at 113. I recognized Dr. McNulty as an expert in economics and statistics. *Id.* at 115. Dr. McNulty submitted four reports in this case (Exs. 66, 78, 85, 100). I do not summarize the reports but incorporate them in my analysis.

Dr. McNulty was critical of Dr. Kennedy's reliance on the Markov work-life model; Dr. McNulty did not dispute its utility and application, but was reluctant to apply it because it did not accommodate an individual's case-specific information. Dr. McNulty also stated the reliability of Markov model could not be measured, and he believed "the core fundamental assumptions those models are built on are likely to be false." Tr. at 123. Regarding the reliability of Markov models, Dr. McNulty believes that it is flawed because there are no actual data points to compare the model to; a model is only good if you can compare the model to actual results but that cannot be done for the Markov model. *Id.* at 128. Dr. McNulty conceded that most forensic economists use the Markov work-life model but also that it is not used outside of forensic economics. *Id.* at 149.

Dr. McNulty also testified about Petitioner's lost Social Security benefits. Both employers and Petitioner's payroll taxes contribute to the Social Security fund. Tr. at 136. The loss of those future payments is included in Dr. McNulty's calculations. *Id.* at 136-37. Dr. McNulty confirmed that the loss of Social Security benefits is considered by both state and federal courts but could not cite to any specific cases. *Id.* at 137. Dr. McNulty testified that he has used his methodology in Vaccine Program cases but was unsure if it had been adopted into a decision. *Id.* at 142-43.

### D. Respondent's Medical Expert, Dr. Roland Staud, M.D.[4]

Dr. Staud submitted two expert reports (Exs. D, L). Dr. Staud serves as the director of the Center for Chronic Musculoskeletal Pain and Fatigue Research at the University of Florida. Ex. D (hereinafter "First Staud Rep.") at 1. Dr. Staud stated that CFS/ME has no approved drugs or widely accepted therapies, therefore it was his recommendation that Petitioner undergo regular physical activity, rest for 10-20 minutes periods for a few times each day on a recliner or couch, undergo cognitive behavioral therapy and mindfulness meditation, and practice sleep hygiene. *Id.* at 4. Dr. Staud did not dispute the benefits of physical therapy and rehabilitation, CoQ10 and NAH supplements, but did dispute all other recommended treatment modalities, medications, and supplements recommended by Dr. Lapp. *Id.* at 5-6.

Dr. Staud's second report addressed Ms. Kattman's life care plan items. Ex. I (hereinafter "Second Staud Rep.") at 1. Dr. Staud reiterated that many of the life care items (suggested by Dr. Lapp, Dr. Smith, and Petitioner's other treatment providers) were either ineffective, unnecessary, or unproven. *Id.* at 6-7.

### E. Respondent's Economist, Dr. Patrick Kennedy, Ph.D.[5]

---

[4] Dr. Staud is a board certified in internal medicine and rheumatology. Ex. E at 1 (hereinafter "Staud CV"). Dr. Staud is a professor of medicine at the University of Florida. *Id.* Dr. Staud has won a number of research and rheumatology related awards throughout his career. *Id.* at 1-2. He is on the editorial board of Anesthesiology News, Pain Medicine News, and Fibromyalgia Awareness Magazine, as well as an article reviewer for many other publications such as (including but not limited to): Annals of Internal Medicine, Journal of Neuroscience, New England Journal of Medicine, PAIN, and Sleep. *Id.* at 3. Dr. Staud has published over 250 papers. *Id.* at 4-21.

[5] Dr. Kennedy has a Ph.D. in economics from Stanford University. Tr. at 157-58. Dr. Kennedy worked as an economist for the Federal Reserve Board of Governors after graduation. *Id.* at 159. He joined

Dr. Kennedy stated that there is a difference of approximately $116,000 between Dr. McNulty's model and his own. Tr. at 163. That difference is a combination of the difference in work life expectancy and Respondent's position that Social Security retirement benefits should be excluded. *Id.* at 163-64.

Regarding work-life expectancy, Dr. Kennedy explained that the statistical work life expectancy factors the movement of individuals in and out of the workforce. Tr. at 164-65. Dr. Kennedy added that he didn't have "a material difference necessarily with when [Petitioner] would leave the work force" but whether he would be in and out of the work force until the age of 67 as Dr. McNulty has proffered in this case. *Id.* at 165.

Dr. Kennedy added that the Markov model, that he used in his reports, is used by forensic economists approximately 60% of the time for determining work life expectancy. Tr. at 166. Dr. Kennedy testified that Dr. McNulty's method is utilized by a small percentage of economists. *Id.* at 167. Dr. Kennedy stated that the statute provides compensation for "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," which is why his use of the Markov model is more consistent with the statutory language of the Vaccine Act, in comparison to Dr. McNulty's approach. *Id.* at 168-69. Dr. Kennedy further elaborated that actuarial principles that he relied upon were published by the Social Security Administration ("SSA") regarding long range projections of wages, employment, mortality, and these are used to calculate expected benefits. *Id.* at 168-69. Dr. Kennedy stated that these actuarial principles, in addition to BLS publications, are used in the Markov model. *Id.* at 169.

Dr. Kennedy also stated that the evidence of later retirement is contrary to what Dr. McNulty has presented. The SSA actually uses actuarial principles in its calculations of benefits making it "actuarially neutral to the beneficiary" at what age they retire; although benefits might be lower when taken earlier, a beneficiary would get benefits for a longer period of time. Tr. at 172-74. Dr. Kennedy also testified that only 15% of men work until age 67, and at least 60% of the population receive benefits at age 65. *Id.* at 173.

Dr. Kennedy disputed Dr. McNulty's methodology regarding Petitioner's projected retirement age. Dr. Kennedy identified Petitioner's prior consistent work history before his injury as not indicative of his projected retirement age. Tr. at 175-76. Furthermore, Dr. Kennedy elaborated that the model that he uses factors in the fact that most Americans will leave the workforce and then later rejoin it; Dr. Kennedy believed that this was a more realistic model than Petitioner's subjective prediction of what he is likely to do 20 years from now. *Id.* at 176-78. Dr. Kennedy reiterated that his methodology factored in earnings history, education level, and age at the time the injury occurred, so it was not a generic model as Dr. McNulty described but had been tailored to Mr. Bryan. *Id.* at 181.

---

Mack|Barclay 25 years ago as an economic loss evaluator, and currently works an economist and Managing Director at Torrey Partners. *Id.* at 160; Ex. L at 1. I recognized Dr. Kennedy as an expert in economics. Tr. at 163.

On cross-examination, Dr. Kennedy did admit that the Markov model would affect women and men differently; women lost more income than men because they tend to have a shorter work-life then men; Dr. Kennedy further elaborated that the gap between men and women is narrowing and the Vaccine Program does not use a typical female work life for damages calculations. Tr. at 193-94.

## IV.  Legal Framework

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested." *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *see also* § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

### A.  Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated & remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The court can look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves*, 109 Fed. Cl. at 589-90. Judge Merow noted that this constituted "the forcing of all suffering awards

into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

## B.  Lost Wages

The Act provides that compensation shall include:

> In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

§ 15(a)(3)(A). As observed in *Brown v. Sec'y of Health & Hum. Servs.*, No. 01-60V, 2005 WL 2659072, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005), calculation of lost earnings must be performed in a "cautious manner in accordance with generally recognized actuarial principles and projections." Petitioners bear the burden of supporting a claim for lost earnings with preponderant evidence. § 11(e). As the Supreme Court has noted, "By its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete confidence, any lump sum represents only a 'rough and ready' effort to put plaintiff in the position he would have been if he had not been injured." *Jones & Loughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983).

## C.  Life Care Items

The Vaccine Program may also award actual unreimbursed expenses which are "reasonabl[y] projected" to be incurred in the future. 42 U.S.C. § 300-aa(15)(a)(1)(A)(iii)(II). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person...but short of that which may be required to optimize the injured person's quality of life. What is reasonably necessary lies somewhere between that which is 'indispensable' and that which is 'advantageous.' " *Scheinfeld v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Fed. Cl. Spec. Mstr. May 20, 1991), cited in *Curri v. Sec'y of Health & Hum. Servs.*, 2018 WL 6273562, at *4 (Fed. Cl. Spec. Mstr. Oc. 31, 2018).

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation,

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or

11

(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

## V.   Analysis

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125, at *9-11, *citing McAllister*, 1993 WL 777030, at *3. In evaluating these factors, I have reviewed the entire record, including medical records, documentary evidence, affidavits submitted by Petitioner and others, and the hearing testimony.

### A.   Petitioner's Award for Actual Pain and Suffering

In determining an award in this case, I do not rely on a single decision or case. Rather, I have reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other relevant cases, as well as my knowledge and experience adjudicating similar cases. As described above, the factors to be considered when determining an award for pain and suffering include awareness of the injury, severity of the injury, and duration of the suffering. Petitioner has requested $250,000 in pain and suffering, and an award of future pain and suffering if I award less than $250,000, while Respondent argues for $100,000.

#### 1.   Awareness of the Injury

In this case, Petitioner's memorandum on pain and suffering (ECF No. 205) states that "awareness is not contested" because Petitioner was a competent adult with no impairments that would impact his awareness of his injury. ECF No. 205 (hereinafter "Petitioner's Pain and

Suffering Memo") at 3. Respondent's damages memorandum (ECF No. 219) does not address this issue. I conclude that Petitioner had full awareness of his suffering.

### 2. Severity of the Injury

Regarding severity, Petitioner has been suffering from CFS since 2011. The Social Security Administration has determined that he is unable to work. Petitioner reported daily pain that he rated a 7 out of 10 during a site visit with the life care planners. Ex. F at 3. Petitioner described some reduction of pain through the various treatment modalities such as massage therapy, chiropractic therapy, and acupuncture, but due to his limited finances, he has been unable to consistently receive these treatments.

Petitioner argues that the severity of his injury "is at the most severe end of the spectrum. [Petitioner] has been robbed of his life." Pet'r's Pain and Suffering Memo at 3. Petitioner worked a full-time job that he loved, had many outdoor hobbies, and was remodeling his home. *Id.* at 4. Petitioner avers that his quality of life is "greatly diminished" and any physical exertion leaves him bedridden for days. *Id.* Ever since the onset of his CFS, Petitioner deals with the following symptoms on a daily basis: pain, extreme fatigue, cognitive issues, post-exertional fatigue, weakness, and unrefreshing sleep. *Id.* at 5. Petitioner's relationships with his wife and children have drastically changed. *Id.*

Respondent's position regarding the severity of Petitioner's injury is that Petitioner's CFS is "mild." ECF No. 219 at 15. Respondent argues that Petitioner was able to work until July 2014, and that Petitioner was fishing and golfing in 2013. Respondent believes that until May 2014, Petitioner's CFS had not required any care. *Id.* at 16. Furthermore, Petitioner's CFS has never required any hospitalization, surgery, injections, or extensive rehabilitation that would lend credence to Petitioner's position that his injury "is at the most severe end of the spectrum." *Id.* (citing Pet'r's Pain and Suffering Memo at 3).

Respondent contends that a majority of Petitioner's CFS symptoms are not related to his CFS but are pre-existing conditions, and therefore should not be compensated. Respondent dedicates four pages of his brief to "Items that are not vaccine related." ECF No. 219 at 11-15. I do not find Respondent's position to be persuasive. With regards to Petitioner's work history, Petitioner's friend and former employer, Bruce Kageorge stated that Petitioner was "out for over a week immediately following the vaccine due to the paralyzing effect it had on him." Ex. 22 at 2. Mr. Kageorge testified that even though he returned to work, Petitioner never returned to his pre-vaccination state; he was given lighter duties and never returned to full speed. *Bryan*, 2020 WL 708984, at *7. Petitioner would be exhausted by the end of the day, and his tremors and memory issues impeded his ability to work. *Id.* Mr. Kageorge allowed Petitioner to take naps to accommodate his condition, but it did not solve the underlying issue. Mr. Kageorge stated that Petitioner finally left his position in 2014 because he was often missing three to four days of work per week. *Id.*

Respondent notes that Petitioner experienced sleep issues prior to vaccination and had a number of pre-existing conditions that are difficult to separate from CFS. Petitioner was diagnosed

with obstructive sleep apnea[6] and uses a CPAP machine, however the touchstones of CFS are wholly unrelated to his obstructive sleep apnea. The CPAP machine, being used to treat Petitioner's obstructive sleep apnea, has not mitigated his unrestorative and excessive sleep issues, which are hallmarks of CFS.

Respondent's argument that Petitioner has a "mild" case of CFS is also not supported by the evidence. Respondent contends that Petitioner has a mild case because he only treats his CFS with medication. Other injuries in the Vaccine Programs can require surgery and extensive physical therapy. However, as Respondent points out, "Treatment is *one way* a petitioner may illustrate severity." *Goldman v. Sec'y of Health & Hum. Servs.*, No. 16-1523V, 2020 WL 6955394, at *8 (Fed. Cl. Spec. Mstr. Nov. 2, 2020) (emphasis added). CFS does not have any approved medications or widely accepted therapies as treatment protocols. *See* Ex. I at 6. Much is still being learned about CFS, therefore the lack of treatment options for CFS should not prevent Petitioner from receiving an appropriate pain and suffering valuation.

Dr. Lapp testified at the damages hearing that he believes Petitioner to have between a moderate and severe case of CFS. Tr. at 34. Dr. Lapp testified that the most severe CFS cases are those where the patient is bedridden. *Id.* Dr. Staud does not offer an opinion on the severity of Petitioner's CFS. The Bateman paper describes a moderate case of CFS as; "reduced mobility, restricted in instrumental activities of daily living, needs frequent periods of rest; usually not working" and a severe case as "mostly housebound; limited to minimal activities of daily living [e.g.] (face washing, showering); severe cognitive difficulties; may be wheelchair dependent." Bateman at 2. This supports Dr. Lapp's testimony and assessment of Petitioner's condition. The life care planner reports corroborate that Petitioner rarely leaves the house, and especially not without his wife. Ex. F at 3. He is able to shower a few times each week but is limited by his energy levels. *Id.* He is limited to using the microwave for food while his wife is at work and does not use the oven or stove because of his memory problems. *Id.* If Petitioner walks too far or does too much housework, Petitioner may sleep 24-36 hours to recover. This is an example of post-exertional malaise and energy metabolism imbalance. Bateman at 4-5. Petitioner has balance issues and difficulty walking and bending due to dizziness, also known as post orthostatic intolerance. *Id.* at 6.

Petitioner went from being an active man with many outdoor hobbies to someone who is homebound and highly reliant on his wife. I do not agree with Respondent's position that this is a "mild" case of CFS.

### 3. Duration of the Suffering

With regards to the duration of his injury, Petitioner's position is that he has dealt with these symptoms for the past 12 years and will continue to live with these symptoms for the rest of

---

[6] Obstructive apnea: sleep apnea resulting from collapse or obstruction of the airway with the inhibition of muscle tone that occurs during REM sleep. In adults it is seen primarily in middle-aged obese individuals, with a male predominance; in children it is often seen accompanying conditions such as adenotonsillar hypertrophy, Down syndrome, or morbid obesity. Obstructive apnea, DORLAND'S ONLINE MEDICAL DICTIONARY (hereinafter DORLAND'S) https://www.dorlandsonline.com/dorland/definition?id=57240 (last accessed on December 20, 2023).

his life. Pet'r's Pain and Suffering Memo at 6.

Respondent argues that Petitioner's CFS is limited in duration. Respondent identifies 2013-2014 as a period of time where Petitioner was highly functional and sought no medical attention until May 2014. ECF No. 219 at 17-18. Respondent then identifies a number of medical records where treating providers attribute his CFS symptoms to other conditions or believe Petitioner is malingering. *Id.* at 18. Respondent also factors in Petitioner's pre-existing conditions as a mitigating factor to Petitioner's pain and suffering valuation. *Id.* at 17.

Although CFS is a waxing and waning condition, Petitioner will have to live with CFS for the rest of his life. Mr. Bryan had a number of pre-existing conditions and was treated for Lyme disease as well as other symptoms throughout the pendency of this case. However, as discussed in the Bateman article, CFS shares many symptoms with other diagnoses and treatment for comorbidities is key to reducing the symptoms of CFS. Bateman at 10, Table 3.

I disagree with Respondent that Petitioner's CFS is limited in duration. Petitioner has suffered from this condition for the last 12 years, with waxing and waning symptoms. Respondent does not discuss any future pain and suffering award, which seems like an oversight given this is a lifelong condition that Mr. Bryan will live with.

### 4.   Comparison to Other Vaccine Program Cases

There is one comparable CFS cases in the Vaccine Program. One that was resolved was *I.D.*, involving a minor's development of CFS. *See, e.g.*, *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1953V, 2013 WL 2448125 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (ruling regarding damages); 2013 WL 10914315 (Fed. Cl. Spec. Mstr. Apr. 27, 2013) (proffer decision). I.D. was a minor at the time of vaccination, and was ultimately awarded $100,000 for past pain and suffering, and $150,000 for future pain and suffering. *Id.* at *10. A notable difference is that I.D. was still able to attend college and was receiving As and Bs with assistance. *Id.* Petitioner I.D. was also awarded life care plan items and lost future earnings. *Id.* at *9.

I have also considered damages decisions involving different injuries in arriving at my determination in this case. Petitioner and Respondent have also cited a number of cases that I find useful. I highlight some below.

Petitioner provided the *Schettl* case as a comparison. Special Master Dorsey awarded Petitioner $200,000 in actual pain and suffering slightly more than seven years after the vaccination at issue, and $10,000/year for the remainder of her life, acknowledging the statutory cap is $250,000. *Schettl v. Sec'y of Health and Hum. Servs.*, 2019 WL 664493, at *1 (Fed. Cl. 2019). Petitioner suffered from chronic regional pain syndrome ("CRPS") which leads her to experience extreme pain and hypersensitivity on a daily basis. *Id.* at *6. Ms. Schettl's chronic pain led to mood changes; she feels tired, crabby, annoyed, angry, frustrated, and anxious. *Id.* Since the onset of her CRPS, she had tried many procedures, medications, and therapies to address her chronic pain, which were unsuccessful. *Id.* Similar to the *Schettl* case, Mr. Bryan will suffer from a chronic condition for the rest of his life; these symptoms are varying day-to-day and affect his quality of life.

I additionally considered the case of *Dillenbeck v. Sec'y of Health & Hum. Services*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), remanded on other grounds. Petitioner received $170,000.00 in actual pain and suffering after her diagnosis of GBS following a flu vaccination. *Id.* at 14. Ms. Dillenbeck was hospitalized for two weeks and had multiple rounds of IVIG therapy. *Id.* at *3. Prior to the flu shot, Ms. Dillenbeck was generally healthy and participated in a number of outdoor activities including hiking and walking with her dogs. *Id.* Petitioner was out of work for approximately four months. *Id.* at *2. During that time, she required live-in care from three family members who helped care for her animals and completed household tasks. *Id.* at *3. Ms. Dillenbeck took eight Gabapentin pills per day due to pain. *Id.* Due to the persistent pain she had trouble sleeping. *Id.* She attended outpatient PT two to three times per week. *Id.* Ms. Dillenbeck had numerous falls even while using her walker. *Id.* She received outpatient physical therapy and was discharged within a month. Ms. Dillenbeck continued to experience lack of sensation in extremities, weakness in her hands, increased sensitivity on chest, abdomen, and back, and generalized fatigue two and a half years post-hospitalization. In this respect, the case is similar to the case at bar. Mr. Bryan, while not hospitalized like Ms. Dillenbeck, was bedridden for weeks at the time of his CFS onset. Mr. Bryan experiences pain and sleep problems and these symptoms have persisted for years, and will continue to persist. Ms. Dillenbeck returned to work after four months, while Mr. Bryan has been unable to do so. Mr. Bryan's limitations seem greater than those suffered by Ms. Dillenbeck, warranting a larger award of pain and suffering.

Respondent provided two GBS proffer cases as a comparison. *See, e.g.*, *Rainbolt v. Sec'y of Health & Hum. Servs.*, No. 17-1533V, 2020 WL 5820956 (Fed. Cl. Spec. Mstr. Aug. 31, 2020); *Stroessner v. Sec'y of Health & Hum. Servs.*, No. 18-37V, 2022 WL 1863926 (Fed. Cl. Spec. Mstr. Apr. 21, 2022). In *Rainbolt*, Respondent proffered $120,000.00 for pain and suffering, the case involved a petitioner with a history of depression, hospitalization for one week, and IVIG treatment; in *Stroessner*, a case where Respondent proffered $175,000.00, the petitioner was hospitalized for one day, received inpatient rehab, IVIG and steroids. ECF No. 219 at 19. Both are SPU ("Special Processing Unit") cases where Respondent conceded entitlement. Other than knowing the petitioners had a GBS Table injury, no details other than those provided by Respondent are known. I cannot ascertain whether the petitioners in these two cases still suffer numbness, pain, or mobility issues that would make them comparable to the case at hand. As such, these cases are of limited utility in assessing an appropriate award for pain and suffering in this case.

In one of my cases, I awarded a petitioner $200,000.00 for past pain and suffering, and $1,000/year for future pain and suffering. *Hood v. Sec'y of Health & Hum. Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Oct. 19, 2021). Mr. Hood suffered from GBS which rendered him unable to continue working as a butcher. *Id.* at *4. Mr. Hood also experienced residual fatigue and numbness in his legs, which made him feel like a burden to his family as he was no longer able to play with his daughter and could no longer work. *Id.* at *4-5. Mr. Hood's condition is not dissimilar to the case at hand; both petitioners have lost their ability to work at jobs that were physical in nature and that they deeply enjoyed. Their injuries have also impacted their familial relationships detrimentally as they cannot interact with their children and grandchildren in a physical capacity,

and cannot contribute to household activities, straining their relationships with their significant others.

Petitioner argues that an award of the full statutory maximum of $250,000 is appropriate. This would equate to less than $21,000/year since the time he developed CFS, which Petitioner argues is a "trivial amount" given what he has endured. Pet'r's Pain and Suffering Memo at 6. Respondent argues that the *Rainbolt* and *Stroessner* cases are more severe than the case at hand.

For all of the reasons discussed above and based on consideration of the record as a whole, I find that $210,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering; I additionally find it is appropriate to award $10,000.00 per year in future pain and suffering until the statutory cap is reached. Petitioner's life has drastically changed since 2011. Petitioner can no longer work because of his CFS and is highly reliant on his wife for many daily activities. Mr. Bryan can no longer perform many physical activities as it would result in him being bedridden and sleeping many hours to recover. CFS has been truly debilitating for Mr. Bryan and he has lived with these symptoms for many years and will continue to do so for many more. Although Petitioner takes medications and undergoes various treatments, they only help to mitigate his symptoms, never relieving him of them. For the reasons discussed above, I award Petitioner $210,000.00 for Petitioner's past pain and suffering and $10,000.00 per year until the statutory cap is reached for future pain and suffering.

### B. Lost Wages

#### 1. Retirement Age

As summarized above, both parties' economists provided testimony regarding their determination of Petitioner's retirement age. Petitioner has submitted an affidavit stating it was his intention to work until age 67. Ex. 77. Petitioner stated that he enjoyed his job very much but he also needed to work until 67 because he had no other source of income that would allow him to retire sooner. *Id.*

Petitioner's brief offered additional criticism of the Markov model. ECF No. 220. Both experts testified on the pros and cons of the Markov model, which I have summarized above. Petitioner identified a paper in which data demonstrated that the Markov model did not match labor market transitions over 15 months and underestimated work-life data. *Id.* at 9. The Markov model is used to summarize average behavior of a large cohort but is not suited for forecasting the behavior of any individual. *Id.* at 10, citing Ex. 91 at 3. Petitioner also identified cases in which other special masters have considered factors beyond the Markov model in making their work-life determinations. *Id.* at 11; *see, e.g.*, *B.A. v. Sec'y of Health & Hum. Servs.*, No. 11-51V, 2021 WL 4737437, at *14 (Fed. Cl. Spec. Mstr. Sep. 7, 2021); *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sep. 17, 2015) (Special Master Millman increased work life expectancy to age 70 based upon testimony of Petitioner).

I conclude it is appropriate to consider Petitioner's position on his retirement age in making a determination on this issue. Other special masters have agreed with the approach. *See, e.g.*, *J.T.*, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sep. 17, 2015). As Petitioner argues, he had a 30+

year work history prior to his injury, and enjoyed his job. Furthermore, Petitioner's salary was limited, thus it is likely that he would have to continue working until age 67 to received maximum retirement benefits. I disagree that because statistics state a majority of white men retire before age 67 this means Petitioner would have as well. I find it appropriate to award Petitioner lost wages until age 67.

## 2. Lost Social Security Retirement Benefits

The parties dispute whether Mr. Bryan should receive social security retirement income to which he would have been entitled had he continued working.

Respondent's position on this issue has evolved over the course of the litigation. Respondent initially contended that Petitioner was not entitled to this lost Social Security retirement income because there was no contractual obligation between the Social Security Administration and an individual; Congress could change the law at any time, and thus benefits could change as well. ECF No. 164 at 2-3. During the damages hearing, I asked Respondent to explain his position. Tr. at 227-28. Respondent requested to brief the issue. *Id.* at 228. Respondent now presents a new argument. He notes that Petitioner currently receives and has received Social Security disability benefits since 2017. ECF No. 219 at 25. Respondent's economist, Dr. Kennedy, calculated that Petitioner will receive a total amount of $333,523.00 in Social Security disability benefits from 2017 to age 67. *Id.* at 25-26. Respondent notes that this sum is greater than the $52,636.00 in Social Security retirement benefits that Petitioner will not receive due to his premature exit from the workforce. *Id.* at 25. Respondent argues that Petitioner, overall, will receive more Social Security benefits throughout his lifetime (almost $281,000.00 more) and therefore should not be awarded lost Social Security retirement benefits.

Petitioner responds that although the funds are distributed by the Social Security Administration, that does not mean they are the same in a damages assessment. Petitioner notes that Social Security retirement income is a form of earnings, and Respondent conceded that at age 67, Petitioner will receive $3,914.00 less per year because he did not work until age 67. ECF No. 224 at 1-3. Petitioner notes that Social Security retirement benefits and disability insurance come from two separate funds and a fully disabled person can received both SSDI and SS retirement income (at separate times). *Id.* at 3.

The Vaccine Program provides compensation for actual and anticipated loss of earnings.

> In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

42 U.S.C. § 300aa-15(a)(3)(A).

The Federal Circuit in *Heinzelman* considered whether a Petitioner was entitled to receive an award of lost wages during the same time that she also received social security disability

payments. The court determined that SSDI was neither a part of the lost earnings calculation under § 15(a)(3)(A) nor an offset under § 15(g). *See Heinzelman v. Sec'y of Health & Hum. Servs.*, 681 F.3d 1374, 1382 (2012).

The first issue to address is whether Social Security retirement income is a part of the loss of earnings calculation. I conclude that it is, and note that Respondent has not contested this point in any of his briefing. The Court of Federal Claims in *Heinzelman* noted the Black's Law Dictionary definition of "earnings": "[r]evenue gained from labor or services, from the investment of capital, or from assets." Black's Law Dictionary 548 (9th ed. 2009). *Heinzelman v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 808, 816 (2011). Social Security retirement income is paid to members during retirement years based on their work history, contributions, and retirement age.[7] It is revenue gained from labor. Further, it is subject to federal income tax, depending on the income level of the recipient.[8] This point is especially persuasive, as social security is listed as "income" on IRS Form 1040.[9] Based on the above, I conclude that Social Security retirement income is a form of "earnings" and thus part of a lost wages calculation under § 15(a)(3)(A).

The Federal Circuit in *Heinzelman* held that "SSDI benefits should not be taken into account in calculating […] 'actual or anticipated loss of earnings' under 42 U.S.C. § 300aa–15(a)(3)(A)." *Heinzelman*, 681 F.3d at 1375. Because Petitioner's Social Security retirement income constitutes anticipated loss of earnings, the plain language of *Heinzelman* dictates that these earnings should not be reduced by the SSDI benefits that Petitioner received.

It is undisputed that Petitioner will receive $3,914.00 less per year in Social Security retirement income as a result of his vaccine injury. ECF No. 224 at 1-3. Based on the above, I conclude that Petitioner shall receive this sum each year, starting at age 67 and continuing through his life expectancy.

## C. Life Care Plan

### 1. Insurance

#### a. *Medicare supplemental Plan G*

The parties are in agreement that Petitioner should have Medicare supplemental Plan G. The parties have a disagreement regarding the premiums of the plan when Petitioner turns 65.

---

[7] Social Security Administration, *Your Retirement Age and When You Stop Working*, https://www.ssa.gov/benefits/retirement/planner/stopwork.html (last accessed March 27, 2024) (stating "We base your retirement benefit on your highest 35 years of earnings and the age you start receiving benefits.").

[8] Social Security, *Request to withhold taxes*, www.ssa.gov/manage-benefits/request-withhold-taxes#:~:text=You%20will%20pay%20federal%20income,taxes%20withheld%20from%20your%20payment (last visited July 11, 2024).

[9] www.irs.gov/faqs/social-security-income (last visited July 11, 2024).

Petitioner has an annual cost of $3,346.68. Respondent believes the monthly premium is $108.29/month or $1,299.48/year.

The parties shall seek clarification on the monthly premium for Medicare Plan G when Petitioner turns 65 and provide an update in a status report.

    b.  *Medicare Part D Premiums*

Respondent argues that this plan is not required for Petitioner's CFS medications. I disagree for several reasons. I find the Bateman paper, collaborated upon and written by 23 CFS experts and published in 2021, to be persuasive. *See* Bateman et al., *Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: Essentials of Diagnosis and Management*, MAYO CLIN. PROC. 2021;96(11):2861-2878 (filed as ex. 94) (hereinafter "Bateman").[10]

As Respondent's medical expert Dr. Staud has opined, there are "no approved drugs for ME/CFS/SEID and there are no widely accepted therapies available." Ex. I at 6. Dr. Staud also noted that "the major goal of therapy for patients with [CFS] is to improve patients' symptoms and function, including fatigue, pain, physical and mental functioning, sleep, and negative effects." *Id.* at 7. Both of Dr. Staud's reports seem to reassign Petitioner's CFS symptoms to his other comorbidities, (depression, sleep apnea, and possible Lyme's disease) rather than address his treatment options. In fact, the Bateman paper includes a table titled, "Medical Conditions That Present Similarly to Myalgic Encephalomyelitis/Chronic Fatigue Syndrome" which lists all three conditions to which Dr. Staud ascribes Petitioner's symptoms (reproduced below).

| TABLE 3. Medical Conditions That Present Similarly to Myalgic Encephalomyelitis/Chronic Fatigue Syndrome | | |
|---|---|---|
| Endocrine/metabolic disorders | Rheumatologic disorders | Neurologic disorders |
| Primary adrenal insufficiency, hypercortisolism, hyperthyroidism or hypothyroidism, diabetes, hypercalcemia | Systemic lupus erythematosus, rheumatoid arthritis, polymyositis, polymyalgia rheumatica | Multiple sclerosis, Parkinson disease, myasthenia gravis, vitamin B$_{12}$ deficiency, cerebrospinal fluid leak, Chiari malformation, traumatic brain injury, spinal stenosis, craniocervical instability, seizures |
| Infectious diseases | Sleep disorders | Primary psychiatric disorders |
| Human immunodeficiency virus infection, Lyme and other tick-borne diseases, hepatitis B/C, tuberculosis, giardiasis, West Nile virus, Q fever, coccidioidomycosis, syphilis, Epstein-Barr virus infection,[a] parvovirus B19 | Sleep apnea,[a] narcolepsy, periodic limb movement disorder[a] | Anxiety,[a] depression,[a] bipolar affective disorder |
| Gastrointestinal disorders | Cardiovascular disorders | Hematologic disorders |
| Celiac disease, food allergy/intolerance,[a] inflammatory bowel diseases, small intestinal bacterial overgrowth[a] | Cardiomyopathy, coronary artery disease, pulmonary hypertension, valvular heart disease, arrhythmias | Anemia (iron deficiency, other treatable forms), iron overload |
| Illnesses related to toxic substance exposures | Oncologic disorders | Miscellaneous |
| Substance abuse disorder, heavy metals (eg, lead, mercury), mold/mycotoxins, adverse medication effects, Gulf War illness | Primary and secondary cancers | Severe obesity (body mass index >40 kg/m$^2$), overwork, athletic overtraining syndrome, asthma, chronic obstructive pulmonary disease |

[a]These conditions can also commonly coexist with myalgic encephalomyelitis/chronic fatigue syndrome.
Adapted from *Diagnosing and Treating Myalgic Encephalomyelitis/Chronic Fatigue Syndrome (ME/CFS)*,[107] with permission of the US ME/CFS Clinician Coalition.

---

[10] Although the Bateman paper was not filed into the record until June 27, 2023, it was referenced in Dr. Staud's first report filed on March 7, 2022. *See* Ex. D at 4, fn. 8.

Bateman at 10. The Bateman paper also states that "[t]reatment of comorbidities can positively affect a patient's quality of life and severity of symptoms. Common comorbidities include… sleep apnea,… and secondary depression/anxiety. Ensure that treatments for comorbidities are also appropriate for ME/CFS. For example, whereas exercise may help patients with fibromyalgia, it can make patients with ME/CFS worse." *Id.* at 14.

I also note that the Bateman paper has a section titled "Outdated Standard of Care" in which cognitive-behavioral therapy ("CBT") and graded exercise therapy ("GET") seemed to have been removed from recommended treatment. Bateman at 11. The paper explains,

> In the past, CBT and GET were studied and recommended for ME/CFS on the basis of the disease theory that "the symptoms and disability of CFS/ME are perpetuated predominantly by unhelpful illness beliefs (fears) and coping behaviors (avoidance [of activity])," leading to considerable deconditioning. However, GET and CBT studies have been widely criticized for their methodology, inadequate tracking of harms, and a disease theory that conflicts with the evidence of multisystem biologic impairment.

> The largest of these studies is the 2011 PACE (Pacing, graded Activity, and Cognitive behavior therapy; a randomised Evaluation) trial. PACE reported that these therapies were safe and resulted in recovery for 22% of participants and improvement for 60% to 61%. However, outcome measures were modified midtrial without a clear rationale. When the data were reanalyzed with the original protocol, improvement decreased by a factor of 3 and recovery rates decreased to 7% for CBT and 4% for GET, not significantly different from controls.

Bateman paper at 11 (internal citations omitted). Dr. Staud's list of recommended treatment is summarized below:

*Although there is no general consensus about the Patient Care Plan for ME/CFS patients, there is wide agreement that it should include[8]:*

1. Regular physical activity associated with Pacing
2. Use of rest-periods (10-20 min) several time per day in recliner/couch
3. Cognitive-behavioral therapy and/or Mindfulness meditation
4. Setting of activity limits
5. Sleep hygiene
6. Improvement of negative affect

Ex. D at 4. Footnote 8 cites to the Bateman paper, but the Bateman paper does not recommend CBT, "regular physical activity,"[11] or "use of rest-periods (10-20 min) several [times] per day in

---

[11] Pacing is recommended by the Bateman paper, but in the context of post-exertional malaise ("PEM"). Bateman at 2871, 73. Specifically, the Bateman paper recommends that "Typically, patients must decrease the total amount of their activities and restrict their exposures to PEM-inducing stimuli as must as possible." *Id.* at 2873.

recliner/couch." *See generally* Bateman. I also note that Dr. Staud does not include this list of treatments in his second expert report. *See generally* Ex. I.

Dr. Staud does very little to discuss medications that Petitioner is currently using and the utility of such medications, other than to say they are experimental and lack sufficient scientific evidence, despite the fact that they are cited in the Bateman paper. Bateman at 12-14. The Bateman paper provides a "Summary of Treatment and Management Approaches," which includes Petitioner's current medications: trazadone, clonazepam, and low dose naltrexone. *Id*.

In summary, I find Dr. Staud's expert reports to be unpersuasive on this issue, as he has apparently not incorporated recommendations from the Bateman paper into his assessment.[12] This paper, published in 2021, contains the most up-to-date information regarding CFS, drafted by experts in the field. Dr. Staud does not present any evidence to rebut this paper.

Dr. Lapp's expert reports addressed Dr. Staud's issues and concerns. He wrote:

> it should not be a surprise that there are no "approved therapies" that are known to provide significant relief for most ME/CFS patients. ME/CFS is a relatively uncommon disorder… the treatments that work for each patient can vary greatly. If a treatment modality works for an individual patient then they should continue with that treatment.

Ex. 79 at 2.

Dr. Lapp further elaborated on the uses of each prescription medication during the damages hearing; he testified to the off label benefits of naltrexone, trazadone, propranolol, and clonazepam. *See* Tr. at 22-26. Dr. Lapp also discussed Dr. Staud's recommendation of CBT and noted it "had come under scrutiny lately." Ex. 79 at 2. Dr. Lapp further elaborated that "CBT in particular has been shown to have limited benefit." *Id*.

In Respondent's memorandum contesting Medicare part D premiums, Respondent argues that Petitioner's prescriptions for conditions unrelated to CFS would be covered in Medicare part D, and therefore it is inappropriate for the Vaccine Program to cover the premium for drug coverage that Petitioner would need to purchase separately if he did not develop CFS. ECF No. 219 at 12. Petitioner took a substantial number of medications prior to his development of CFS.[13] I find it difficult to understand why drug coverage for Petitioner's other conditions would exclude Petitioner's needs for his off label CFS prescriptions. Because Respondent has taken the position

---

[12] Dr. Staud's second/responsive expert report (filed on 12/2/2022) does not cite to or reference the Bateman paper, despite Dr. Lapp's reference to the Bateman paper as the "Mayo consensus report" in his report. *See* Ex. 79 at 1 (filed 6/22/2022).

[13] Petitioner was on the following medications as of October 10, 2011: Promethazine, Sertraline, Wellbutrin, Simvastatin, Zithromax, Zolpidem, AndroGel, and Abilify. *See* Ex. 2 at 3. His current CFS medications are listed and discussed below.

that Petitioner's CFS requires no medications and treatment modalities, I find their position on Medicare premiums, and other areas of damages (described below) particularly unpersuasive in light of Dr. Lapp's testimony and the Bateman paper.

Petitioner currently pays out-of-pocket for the medications he is requesting. In Petitioner's sworn declaration signed on June 10, 2022, he listed trazadone, lorazepam, clonazepam, and naltrexone as medications he was taking for his CFS symptoms. Ex. 83 at 2. Petitioner also stated that, "Right now my medication and supplements are in a good place and it has been trial and error along with an extensive amount of time to get here. I feel that all of my current prescription and supplements are medically necessary for my health and well being." *Id.* at 3. As of July 2023, Petitioner still actively took the medications listed above. *See* Ex. 98. During the life care planners' site visit via Zoom on December 22, 2020, Petitioner reported daily pain that was migratory from his feet, knees, hips, shoulders, neck, hands, and wrists; described the pain as aching to sharp, or spasms; his pain that day was a 7 out of 10, which was normal. Ex. F at 3.

Other than Respondent's argument that there are currently no FDA approved medications for CFS and pharmacological and non-pharmacological treatments for CFS have been "largely disappointing," Respondent cannot refute the relief experienced by Petitioner with his current medications. *See* Ex. I at 6-7. Just because Petitioner has other comorbidities, I will not deny him medication he readily uses and relies on.[14] I grant Petitioner the lesser total of either: Medicare Part D premiums, a total of $75.60/month or $856.80/year for life; or alternatively the monthly costs of Petitioner's CFS medications. The parties will calculate which amount is lower and submit their findings in a status report.

### 2. Medical Follow Up

#### a. *Primary Care Physician and ME/CFS Specialist*

Petitioner requests $585 for an initial consultation with a new primary care physician ("PCP"), Dr. Bettina Herbert, who is also a functional medicine specialist, in South Carolina, and $580-870 for two to three visits per year with Dr. Herbert. Dr. Herbert does not accept Medicare insurance. Respondent believes that Petitioner should find a new PCP who takes Medicare, which would be $0 with Petitioner's Medicare and Medicare supplemental coverage.

Regarding additional care, Petitioner requests $498 for an initial consultation with a ME/CFS specialist, preferably with Dr. Lapp, and $747 for one 1.5 hour in-person visit, and $498 for a 45-minute telehealth visit per year. Respondent's position is that Petitioner can seek a ME/CFS specialist who accepts Medicare insurance, which would equal $0 out-of-pocket expenses for Petitioner.

---

[14] Respondent's life care planner implies that if not for Petitioner's 14 other medications, he would not need extra drug coverage for his CFS medications; "Based on Mr. Bryan 14 medications… that are not related to CFS per Ex. 71, it is more likely than not he would have a Medicare Drug Plan." Exs. P at 1, Q at 1. Ex. 71 is a summary of phone call between Dr. Smith and the parties' life care planners where there is no discussion of Medicare drug coverage. In the four-page summary of the phone call written by Ms. Kattman, two sentences are dedicated to Petitioner's other medications. Ms. Fox did not testify during the damages hearing to elaborate on this point.

Dr. Herbert's website indicates that she treats many of Petitioner's issues, including chronic fatigue. https://www.gesundheitcarolina.com/medical-therapies (last accessed Nov. 16, 2023).

As of 2022, Petitioner has established care with Dr. Bryan Tompkins, D.O. Ex. 99 at 4. In response to Ms. Kattman's testimony, Ms. Fox filed a responsive report. Ex. S. Ms. Fox identified the Medical University of South Carolina ("MUSC") as a hospital where Petitioner can locate a provider to treat Petitioner's CFS and is located about an hour away from Petitioner's current residence. Providers at MUSC also accept Petitioner's insurance. *Id.* at 3.

I understand Petitioner's desire to see a particular provider for his care, but Petitioner's health care is covered by insurance and it is unreasonable to pay out-of-pocket for care that is otherwise covered. I deny Petitioner's request for compensation to treat with providers who do not accept Medicare, and encourage him to find a medical provider that accepts his insurance.

b. *Chiropractic Treatment*

Petitioner requests 48 visits with a chiropractor per year for the rest of his life, or a total of $1,980/year. Respondent's life care plan provides for 12 visits/year as covered by Petitioner's Medicare insurance but does not recommend chiropractic treatment for CFS.

In the life care plan reports, and in the letter submitted by Petitioner's previous chiropractor, Petitioner experienced relief from consistent chiropractic treatment. *See* Ex. 70 at 2-4. Specifically, Dr. Hobbie stated "[Petitioner] does better with weekly treatment" and "he would benefit from chronic maintenance for mobilization of his spine. His muscles are tight and hypertonic." *Id.* at 2-3. Dr. Hobbie recommended weekly chiropractic care and massage therapy. *Id.* at 3. Dr. Lapp recommended chiropractic care every two weeks. Ex. 79 at 2. The Bateman paper listed chiropractic treatment as a pain management approach but did not recommend a specific number of visits. Bateman at 12. In contrast, Dr. Staud stated "repeated chiropractic manipulations" were "either experimental or lack sufficient scientific evidence." Ex. D at 5. I find Dr. Staud's broad statement unconvincing and rely on Dr. Lapp's medical opinion, the Bateman paper, and statement from Petitioner's previous chiropractor. Chiropractic treatment has been awarded in the Vaccine Program. *See, e.g., B.A.*, 2021 WL 4737437 at *7; *Schettl*, 2021 WL 6502203 at *5. Accordingly, I will grant Petitioner chiropractic treatment twice per month, or 24 times per year, for a total of $660/year for the rest of his life, to be offset with the Medicare's allowance for 12 visits a year.

c. *Acupuncture*

Petitioner requests weekly acupuncture treatments for a period of six weeks, for a one-time cost total of $450, and then treatment every other week for 21 weeks per year, for an annual total of $1,575. Respondent contends that this is not an effective treatment for CFS and recommends denying this award.

Petitioner has experienced relief from this treatment and his treater have seen improvement from this treatment modality. *See* Ex. 69. His previous acupuncturist recommended weekly sessions for eight weeks, then every other week, and then every third week. *Id.* at 1. Dr. Lapp recommended acupuncture every two weeks and the Bateman paper includes acupuncture as a pain management treatment. *See* Ex. 79 at 2l; Bateman at 12. I will not grant Petitioner's request for six consecutive weeks of treatments but will grant him 15 treatments per year to add to his chiropractic visits.

### d.  *Massage Therapy*

Petitioner requests 36 visits per year for massage therapy for an annual total of $2,340 for the rest of his life. Respondent also argues that this is not an effective treatment for CFS and recommends that I deny this treatment to Petitioner.

Petitioners are frequently awarded massage therapy treatments for a wide number of injuries, such as SIRVA and neurological injury. *See, e.g.*, *Schettl*, (involving CRPS and massage therapy and chiropractic therapy); *Coubois v. Sec'y of Health & Hum. Servs.*, No. 13-939V, 2016 WL 2765092 (Fed. Cl. Spec. Mstr. Apr. 20, 2016) (massage therapy); *Bratt v. Sec'y of Health & Hum. Servs.*, No. 11-900V, 2016 WL 748447 (Fed. Cl. Spec. Mstr. Feb. 2, 2016) (CIDP and massage therapy); *Harper v. Sec'y of Health & Hum. Servs.*, No. 16-1215V, 2017 WL 6629365 (Fed. Cl. Spec. Mstr. Nov. 30, 2017) (GBS/CIDP and massage therapy); *Bergstedt v. Sec'y of Health & Hum. Servs.*, No. 11-633V, 2014 WL 3735540 (Fed. Cl. Spec. Mstr. July 9, 2014) (ADEM and massage therapy expenses). Dr. Lapp recommended massage therapy every two weeks as well. Ex. 79 at 2. I find that based on the Bateman paper and Petitioner's previous treatment history, this modality is also appropriate. I will award Petitioner 24 treatments per year, or an annual total of $1,560 for the rest of his life.

### e.  *Hyperbaric Treatments*

Petitioner requests $5,600 to undergo a trial of hyperbaric oxygen treatments. Respondent maintains this is not necessary for treatment of CFS.

Petitioner's request to undergo a one-time trial of hyperbaric oxygen therapy is denied. Dr. Smith is the only doctor who recommends this treatment to Petitioner.  Dr. Lapp testified during the damages hearing that it was not one of his preferred treatments for patients because it was "expensive," "difficult to find," and "not long-lasting." Tr. at 35. Furthermore, Dr. Lapp opined that the canvas or cloth-like sack/cocoon, or home model that Dr. Smith recommended "would not be effective." *Id.* at 18. Petitioner has not undergone treatment with this modality, and therefore, it is not clear that it would be effective. The treatment modality is also not among those listed in the Bateman article. For these reasons, I deny Petitioner's request.

### f.  *Joovv (Red) Light Therapy*

Petitioner requests $2,395 for the purchase of Joovv light therapy device. Respondent contends this is not necessary for treatment of CFS.

Red light therapy is unproven as a CFS therapy. *See* Ex. 83 at 2. Dr. Lapp did testify to some possible benefits of this therapy but again Petitioner has not undergone this treatment and this would be a speculative trial. Tr. at 19-20. Similar to the hyperbaric oxygen treatments, the Bateman article does not include red light therapy amongst its extensive list of effective treatments for CFS.[15] Because of this, I deny Petitioner's request.

### 3. Prescription Medications

#### a. *Naltrexone*

As noted in the "Medicare Part D Premiums" section (hereinafter "V(C)(1)(b)"), there are no approved medications or treatments for CFS. The Bateman article notes that low dose naltrexone helps CFS patients with pain management. Bateman at 13. Based on this, I grant Petitioner a total of $564/year, which is the cost of the medication annually with the Medicare Part D offset.

#### b. *Trazodone*

*See* V(C)(1)(b) and V(C)(3)(a). I grant Petitioner a total of $48/year, which is the cost of the medication annually with the Medicare Part D offset.

#### c. *Propanalol*

*See* V(C)(1)(b) and V(C)(3)(a). I grant Petitioner a total of $48/year, which is the cost of the medication annually with the Medicare Part D offset.

#### d. *Lorazepam*

Dr. Lapp testified Petitioner was trying to stop using lorazepam. Tr. at 25. Dr. Lapp also stated during the damages hearing that lorazepam and clonazepam are in the same class of drugs and that "it's sort of superfluous to take both at the same time,"; and he just recommended clonazepam. Tr. at 46-47. Therefore, I will deny Petitioner the annual cost of this drug.

#### e. *Clonazepam*

*See* V(C)(1)(b) and V(C)(3)(a). I grant Petitioner a total of $48/year, which is the cost of the medication annually with the Medicare Part D offset.

### 4. Supplements and Vitamins

Petitioner is awarded compensation for supplements and vitamins: curcumin, vitamin D, and vitamin B. Dr. Lapp testified that curcumin is known to be anti-inflammatory and helps people with joint discomfort with joint stiffness and soreness. Tr. at 27. Dr. Lapp also testified that CFS patients tend to have low vitamin D and B12 levels, and he wouldn't prescribe these supplements to patients who have normal vitamin D and/or B levels. *Id.* at 28.

---

[15] The Bateman article does list "light therapy" but not specifically red light therapy. Bateman at 12.

Homeopathic medicines have been awarded in Vaccine Program cases. *See, e.g.,* G*oldman v. Sec'y of Health & Hum. Servs.*, No. 16-1523V, 2020 WL 6955394, at *11 (Fed. Cl. Spec. Mstr. Nov. 2, 2020) (awarding homeopathic medications like vitamin B complex and turmeric root extract); *Hampton v. Sec'y of Health & Hum. Servs.*, No. 13-776V, 2016 WL 5001243, at *3 (Fed. Cl. Spec. Mstr. Aug. 12, 2016) (awarding life care items such as Vitamin D3, Vitamin B12, Omega 3, and Vitamin K2); *Abeyratne v. Sec'y of Health & Hum. Servs.*, No. 14-830V, 2016 WL 6806270 (Fed. Cl. Oct. 14, 2016) (awarding the costs of vitamin D supplements). As such, I will award the costs of Petitioner's vitamins and supplements.

### 5. Assistance

Petitioner requests 35 hours of assistance per week, or five hours/day, until age 64 and 50 hours per week, or roughly seven hours/day, for age 65 to life. Respondent's position is that Petitioner will only need 20 hours of help from now through the rest of his life. Ms. Kattman did testify briefly that Petitioner's current condition was already poor, and she did not necessarily foresee that Petitioner's CFS would worsen, since it has largely stabilized, but that naturally as a person ages, they will need additional assistance. Tr. at 70. Petitioner's wife currently assists him in many aspects of his life, and still works a full-time job. *Id.* at 71. The Bryans do experience some marital issues currently and thus if Mrs. Bryan were no longer a part of Petitioner's life or fell ill herself, Petitioner cannot depend solely on Mrs. Bryan. *Id.* Ms. Kattman stated that assistance would also ease marital tensions. *Id.* Ms. Kattman conceded that she and Ms. Fox disagreed on what was "reasonably necessary" with regards to the number of hours, not whether Petitioner needed assistance. *Id.* at 96. Neither Ms. Kattman nor Ms. Fox explained how they arrived at the appropriate number of hours per week. Ms. Kattman did highlight some activities that Petitioner needs assistance for: transportation, daily household activities, meal preparation, clean up, shopping, and errands. Ex. 92 at 7. Ms. Fox noted assistance was needed for community access and transportation. Ex. P at 5.

I am persuaded that Petitioner will need additional help as he ages. I do not see persuasive evidence that Petitioner currently requires five hours of assistance per day right now. Petitioner naps off and on throughout the day and would not require assistance during that time. Petitioner can move around in a limited capacity currently but may have more difficulty as he ages. I believe assistance would be useful for meal preparation, household chores, and getting to his various medical appointments and treatments. Based on the above, I will award Petitioner 20 hours/week until age 65 when he will receive 42 hours/week of assistance.

### 6. Case Management

Petitioner's position is that he will need 36 hours or sessions of case management for the first two years, after that 24 hours or 12 visits, or $2,400, per year after the first two years. Respondent agrees to 36 sessions during the first two years believes a reduction to $1,200 is more appropriate for the rest of his case management.

I agree with Respondent that Petitioner's case management should be relatively stable and will therefore grant $1,200 yearly after the first two years.

7.  Equipment

a.  *Scooter*

Petitioner requests the EV Rider Vita Monster All Terrain scooter recommended by Dr. Smith, at the price of $6,899. Respondent contends that cheaper all terrain scooters are available on amazon.com for approximately $2,499. Dr. Smith provided a letter to support the EV Rider All Terrain scooter. Ex. 92 at 16. Specifically, Dr. Smith stated that she recommended this specific model because it allowed Petitioner "the ability to spend time outdoors." *Id.* The specific features Dr. Smith noted in her letter were: it has 4 wheels, is heavy duty and portable, comes with a full LED light package, rearview mirrors, a rollbar for safety, captain's seat for full back support, an adjustable headrest and rests, and allows Petitioner the ability to walk his dogs. *See id.* Dr. Smith stated that the "EV Rider Vita Monster All Terrain Scooter is medically necessary for [Petitioner's] medical condition." *Id.*

During the first part of the damages hearing, Ms. Kattman testified that she did not know why Dr. Smith "didn't prescribe another one or what she did and her process was in determining the most appropriate one." Tr. at 93-94.

I am unconvinced by Dr. Smith's letter, which is also reflected in Ms. Kattman's testimony. As Ms. Fox has stated, other all terrain scooters are available on Amazon, for a third of the price as the EV Vita Monster scooter. A cursory search of "all terrain mobility scooters" on amazon.com yields results as low as $750. I selected a model with similar features as the EV Rider Vita Monster to compare. *See* https://www.amazon.com/Xmatch-Electric-Mobility-Battery-Powered-Adjustable/dp/B0B462XNY5/

This model costs $2,499 with a $399 delivery fee. It has 4-wheels, is suitable for all terrains, has a higher range, incline capacity and weight capacity than the EV Vita Monster model. It has many of the same features identified by Dr. Smith such as: a driving light, headlight, rearview mirrors, an "executive seat" with forward/backward tilt and flip back armrests, an adjustable headrest, full 4 suspensions with shock absorption, and preventative tipping wheels. A notable feature of this scooter is that there are "spare parts available in our US distribution center," videos and guides on how to replace parts, and a post-sale service engineer is available to help in repairs if needed.

This particular scooter has many features and is well-described and well-reviewed on amazon.com. Ms. Fox identified a near identical model in her September 4, 2023 expert report. Ex. S at 6-7. Ms. Fox did not include the $399 delivery fee for the scooter model she identified.

Petitioner has not articulated why the EV Vita Monster scooter is medically necessary when other comparable models are available at a substantially lower price. Accordingly, I award Petitioner $2,898 to cover the cost of an all-terrain scooter along with the delivery fee.

b.  *Scooter Replacement, Maintenance, and Battery*

I award Petitioner $2,898 for the price of a replacement scooter every seven years. I agree with Respondent's estimation regarding scooter maintenance. I grant Petitioner $100 every year for scooter maintenance except for the year of purchase.

### c. *Vehicle Carrier*

The parties do not dispute the "reasonable necessity" of a vehicle carrier, merely the time frame between each replacement. I find Ms. Kattman's argument, that every scooter would need a new vehicle carrier, to be persuasive. Tr. at 76. I award $235.57/year or $1,649/7 years to Petitioner.

### d. *Manual Wheelchair*

I hereby deny Petitioner's request for a manual wheelchair. Petitioner is still mobile and his outdoor activities can be aided with the scooter granted above. Furthermore, Ms. Fox noted that Petitioner's Medicare insurance would cover the price of a wheelchair fully should one be "medically required." Ex. S at 7.

### e. *Grab Bars*

Reports from both life care planners have indicated that Petitioner's previous home in Pennsylvania had grab bars in the bathroom. Exs. 68 at 51, F at 4. It is unclear to me whether Petitioner has grab bars in his current residence. The parties shall ascertain whether Petitioner currently has grab bars in his bathroom and provide an update in a status report.

The parties have otherwise agreed that Petitioner shall have grab bars for life, to be replaced or updated every 10 years.

### f. *Pill Boxes*

Respondent contends that Petitioner currently has a pill box in his possession, and a pill box is not required for his CFS medications. As I explained above in V(C)(1)(b), off label prescription medications have been helpful to Petitioner, as there are no FDA approved treatments for CFS. Furthermore, Petitioner has short term memory issues, difficulty with problem solving, and is "often in a brain fog." Ex. F at 2, 5. Petitioner's wife manages his medications, refills his pill box weekly, and requests and picks up his refills. Ex. 84 at 2. I find it is appropriate to compensate Petitioner the cost of purchasing pill boxes; accordingly, Petitioner is awarded $2.60/year or $13 every five years.

### 8. Housing Modifications

### a. *"Accessible Home"*

I am unpersuaded by Petitioner's argument regarding an award of $108,938 for housing modifications. Ex. 92 at 12. As of the date of the damages hearing, Petitioner had not yet settled in a permanent home and has not received a professional estimate for housing modifications. Ms.

Kattman also believed that the Bryans would likely factor accessibility into any house they did purchase, and therefore might need fewer modifications. Tr. at 96. Because this is a speculative cost, I deny Petitioner's request.

### b. *Handyman*

I grant Petitioner $945/year for 15 hours of work by a handyman. It is clear to me given the nature of Petitioner's previous employment that he would have done these types of tasks at home had he been able. Mrs. Bryan also stated that Mr. Bryan used to do home improvement projects in their home before the onset of CFS. *Bryan*, 2020 WL 7089841, at *7. Accordingly, Petitioner cannot perform these tasks as a result of his vaccine injury, and it is appropriate that he be compensated for the cost of handyman services.

### c. *Vehicle Cleaning/Detailing*

Because Petitioner very rarely drives his car, this cost is denied.

### d. *Snow Removal/Yard Care*

Petitioner requests snow removal and yard care expenses. Petitioner currently does not have a home where yard care is required. He has also moved to South Carolina, where snow fall is much less likely to occur than in Pennsylvania. Accordingly, I deny Petitioner these costs.

### 9. Medical Mileage

Medical mileage is to be calculated in accordance with the "Medical Follow Up" section above. It is Respondent's estimate that MUSC is about 100 miles from his current residence. The parties can provide an updated amount of compensation for medical mileage in the joint status report.

### 10. Past Out-of-Pocket Expenses

It is unclear whether Petitioner has submitted all documentation for his past out-of-pocket expenses, however the parties have identified a number of items that are still in dispute with supporting documentation; this includes medications, experimental treatments, and transportation expenses. Ex. O.

Petitioner filed an updated memorandum on past out-of-pocket expenses, totaling $6,324.90 for oxidative therapy, various medications, and curcumin. ECF No. 203. For the same reasons as V(C)(1)(a), I grant Petitioner's request for past out-of-pocket medication expenses. For the same reasons as V(C)(4), I will also grant Petitioner's curcumin expenses.

I deny Petitioner's request for oxidative therapy costs. As Respondent noted in his memorandum, the records indicate that oxidative therapy was for treatment of Lyme disease and not for CFS. ECF No. 219 at 22; *see also* Ex. 51 at 142-47 (Dr. Mulders referred to as a Lyme disease specialist). I note that Petitioner never received a definitive Lyme disease diagnosis, and

Lyme disease is noted as a condition that could be misdiagnosed in CFS patients in the Bateman paper; however, the records are unclear how oxidative therapy works. Furthermore, oxidative therapy is not a recommended treatment in the Bateman paper. *See generally* Bateman at 12-13.

## VI.    Conclusion

In light of the above analysis, and in consideration of the record as a whole, I find that Petitioner shall be awarded $210,000.00 in compensation for past pain and suffering and $10,000.00 per year for future pain and suffering. In addition, Petitioner shall receive lost wages, life care plan items, and other damages items as articulated in this Ruling.

By **Wednesday, August 14, 2024**, the parties shall file a joint status report (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, and (2) confirming that all items of damages have now been resolved and that no issues remain outstanding. Once these issues have been resolved, a damages decision will issue.

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master